May it please the Court, I'm John Sampson, Assistant Attorney General representing the Respondent Appellant. I would like to reserve five minutes for rebuttal. If you will try to keep track of your time, I will try also, but no guarantee. Please. Thank you, Your Honor. The habeas corpus statute imposes a highly deferential standard of review that bars a grant of relief unless the state court adjudication of a federal claim was contrary to or an unreasonable application of federal law. The fact that the federal court finds that error occurred at trial or the fact that the court believes a state court decision was erroneous is not enough. It has to be objectively unreasonable. And when the rule applied as a general rule Do you think it's an unreasonable determination of fact standard or an unreasonable application of law? I believe it's an unreasonable application of the law standard, Your Honor, that law being the Jackson v. Virginia standard. And the question being not whether the judge below believed the evidence was sufficient or whether the judge believed that a reasonable doubt still existed, but whether the state court reasonably determined whether any rational jury looking at this evidence, viewing the evidence as a whole in the light most favorable to the prosecution, and presuming that the jury resolved any conflicts in favor of it. May I ask you a question? Are you familiar with Taylor v. Maddox? I am familiar with Taylor v. Maddox, Your Honor. Doesn't that seem to you to say that when you're looking at an insufficiency, the evidence question on habeas, that you use the unreasonable determination of facts test? I am aware that I believe there's a dispute in the circuit as to whether 2254 D.1 or D.2 applies. I don't believe that this Court has resolved that issue, and certainly the Supreme Court has not resolved that issue. And I argue that D.1 applies. And Petitioner has not argued that I believe that D.2 applies. Well, I'm not sure it makes a lot of difference. I was sort of curious as to which standard we should apply, and I guess that's something we should look into. That can be looked into, Your Honor, and it's our position that D.1 applies. But even if this was not a 2254 D. case, even if this was pre-ADIPA law, the district court still erred in granting relief because the court failed to apply the proper substantive standards in reviewing the two claims in which the court granted relief. Addressing the first claim, the insufficiency of the evidence, the evidence has to be viewed in the light most favorable to the prosecution, and the court must presume that the jury resolved all conflicts in the evidence in favor of the prosecution. And the judge below did not do that. The judge said essentially, I find a reasonable doubt exists, and therefore there was insufficient evidence. Well, let's assume we were going to apply the correct standard in the de novo review. And tell us what provides the sufficient evidence in this case. Let me be a little more direct about that. If it were any passenger in the car other than this defendant, I think there would be considerable doubt as to whether you could support a guilty verdict there. What is it about this defendant, or is there anything about this defendant, other than that he was the driver of the car? Well, I think the fact that he was the driver of the car plays an important role. Yes, that's why I separated that out. I said other than that. There is a great deal. But first, because he was the driver, as the prosecutor and the state courts argued, he was a classic example of the accomplice, the getaway man, the man who drives the vehicle. In this case, there was other evidence besides his mere driving that showed he acted as an accomplice, that he had general knowledge that he was aiding in the commission of the crime, the crime being homicide. And that evidence includes the fact his own admission he was a gang member who went to Ballard High School seeking revenge against a rival gang. Prior to the second trip where the shooting occurred, he went to and got Mr. Viencio, who was generally known as the keeper of the gun, who then brought the gun back to the Navarre house, gave the gun to Ruggiero. Is there any evidence that he knew that Mr. Viencio was the keeper of the gun? There was evidence that the gang members in general knew. There was evidence that the gun was displayed at a party where all the gang members were present. Now, Mr. Viencio said on cross-examination, oh, Mr. Sarasota never knew this. He's never been in my car. He didn't know I had the gun. The jury is presumed to have disbelieved that evidence. The jury is presumed to say, looking at Mr. Viencio when he was testifying about that portion, we don't believe you. But regardless of whether he knew that he was the keeper of the gun, he certainly, there was reasonable evidence sufficient to show that a jury could reasonably infer that Mr. Sarasota knew Ron Keel was armed with the gun. He admitted. He and somebody else met up with Mr. Viencio and a person who was going to be initiated into the gang, and he brought them back to the house for the initiation. Yes. Then the gun was given to Mr. Ron Keel. Then they got in, Mr. Sarasota and Mr. Ron Keel. Not when Mr. Sarasota was present. That is correct. But then they, Ron Keel and Sarasota, got into the small compact car, sitting side by side. Ron Keel was armed with the gun. Mr. Sarasota admits he, at one point, he did see the gun. Now, his testimony at trial was that he saw the gun when he pulled it out and shot. Right. Okay. He didn't see the gun before then. Right. But the jury can reasonably infer that he saw Mr. Sarasota tie the bandana on his face because that takes more than a nanosecond, that petitioner claimed. It would take it to pull the bandana up over your face would take a second. No. There was no testimony that he merely pulled it on. The testimony was that he had it on his face, and that would require him, a jury could reasonably determine. Do we know where the bandana was before they got to the point? No, Your Honor. Was it in his lap? Was it in his back pocket? Was it tied around his neck? The evidence is not clear where it was. There is evidence that he carried the bandana with him. Is there any direct evidence that he saw the bandana being put on? There was evidence that he admitted seeing at some point in time that bandana on Ron Keel's face. No, I said being put on. Being put on, there was not direct testimony to that fact, Your Honor. But as one of the counsel for the co-defendants argued in the state court trial, it's not credible to believe that in this small car nobody saw him putting on this bandana. I'm not talking about nobody. I'm talking about the driver. Exactly. The driver is driving the car. His passenger is putting on a bandana. Sometimes the driver is paying attention to his driving rather than to his passenger. So is there any direct evidence that the driver saw the passenger put on the bandana? There is circumstantial evidence which is sufficient. I think then your answer is no. And I said there is no direct testimony to that fact. But a jury can reasonably infer from the circumstantial evidence, and this court must presume that it did, that he saw the bandana. Did the bandana have any special significance to the gangs? Was this a gang color? It was. It was the blue bandana because they were a Crips gang and blue is a Crips color. And there was testimony by a ---- Possibly he was wearing it on his head and pulled it down instead of pulling it up. I don't know where it was, Your Honor. There was testimony that during the first drive-by they were waving their bandanas and showing them to the rival gang. There's no doubt that they were going there to cause a fight or a hassle. The question is whether they were going there to shoot somebody. So what does it mean that he and I assume several of the others had these bandanas and that they were going to show their gang colors? No one disputes that's why they were going down to Ballard I. Your Honor, it's one piece of the puzzle. And what the court below aired was viewing each piece in isolation rather than as a whole. But the question is not really in this case whether they were going down there to hassle the other gang or to have a fight. So anything that just shows that that was their purpose I think doesn't advance the conviction very much. The question is what shows that they were going down to shoot somebody instead of to do what they did the first time, to get out and hassle a few people. They knew. They discussed in the car on the way there whether they would shoot them. Well, as I read that testimony, the one who testified that they said, Are you going to cap him? The question was, Well, did you say anything? They said, No. As soon as they said that, it was while he was about to shoot and was shooting. There wasn't even time to say anything then. That was Mr. Mark's testimony. Mr. Gosho's testimony was that after he got into Sarasot's car, everyone in the car discussed what they would do, and one of the possibilities was shooting. And during that discussion, someone said, We have a gun. And then after that, Mr. Mark's testimony about are we going to cap can be seen, reasonably seen by a rational jury, viewing the evidence in the light most favorable to prosecution, that that are we going to cap was merely a confirmation of the prior statement. And the Court cannot isolate each of these pieces of evidence. They must be viewed as a whole. And any rational jury could look at this evidence and say, Yes, he did have general knowledge that a shooting was going to occur. Before your time runs, I'd like to look at the, I guess I'll call it the Winship issue and the Jackson issue. And that is, was the prosecution relieved of a burden, of the burden of proving beyond a reasonable doubt every element of the crime? And, of course, I'm after what appears to have been some jury confusion, if that's the right word, arising out of the prosecutor's argument in for a diamond for a dollar. The prosecutor in closing is very, the prosecutor is very clear. The prosecutor is very, I mean, had a nice gift of clarity. The prosecutor says, Now, listen, here's the example. If somebody is asked to hold somebody's arms behind his back so that the other guy can hit him, and he does so in order that the other guy can hit him, but instead the other guy kills him, well, he's liable as an accomplice to killing. Even though he had absolutely no idea that the killing was going to take place, he just thought he was going to hit him. Therefore, in for a diamond for a dollar. So it's very clear what he means. The jury obviously has trouble understanding what that is. Your Honor, I'm sorry. I'm sorry to interrupt. But what the prosecutor was describing was accurate. That is second-degree felony murder. And in Washington at the time, second-degree felony murder could be based on an assault. So if you were accomplished... Are we talking felony murder or are we talking accomplice liability? No, but the prosecutor was merely explaining in general accomplice liability. The prosecutor then clarified that what Mr. Sarasov was the accomplice to was the shooter. And the prosecutor repeatedly said that Mr. Sarasov was acting as the driver. They had gone there originally to fight the first trip. They knew that fighting didn't work. They knew that shouting didn't work. They knew that shooting would work. He acted as the driver in a manner that facilitated the shooting. That was what the prosecutor said. I'm not sure you and I have yet sort of come to terms with what my question is and therefore what your answer is. I think Mr. Sarasov's theory on this part of his case is I knew that we were going there to do something. I knew that we were going there to sort of show our gang toughness.  What I didn't know was that he was going to shoot. And the prosecutor says, well, so long as he knew that they were going to do anything that was going to be a criminal activity, for example, criminal assault, it doesn't matter that the criminal activity turned out to be homicide. So long as he knew and was facilitating any form of criminal activity by his driving, he's guilty as an accomplice to the homicide. That's what the prosecutor is saying. Do you agree that that's what the prosecutor was saying? No, Your Honor. What was the prosecutor saying then? The prosecutor was saying that if he knew and he did know, had general knowledge, or a reasonable person in his same situation would know, and that's the statute and that's what the jury said. Would know what? Would know they were engaging in or aiding in the commission of a homicide or a drive-by shooting. No. Well, I thought the prosecutor was very clear, and that's not what the prosecutor said. Well, Your Honor, with all due respect, this is a state law issue. The state court said this was proper argument. It properly stated Washington law, and that ruling is binding on this court. So I understand. You know, I've read the Washington Supreme Court case on this one, the various cases, including this one. I simply disagree with you as to what the Washington court said. And I understand, Your Honor. And I'm absolutely understanding that I defer to what the Washington state court says, the Washington law. Of course that's right. Yes, Your Honor. But what the prosecutor said and what the state court of appeals said and what the state Supreme Court said in this case was the prosecutor's argument focused on the knowing aiding of the shooting, not going there merely to fiscify it. But that's a different question as what the law is. That's a question what the prosecutor said. I'm perfectly capable of reading what the prosecutor said and disagreeing with the Washington Supreme Court as to what the prosecutor said. But what the state court said was this was a proper statement of Washington law, and that is binding on this court. The fact that the prosecutor's argument complies with Washington law is binding. And because the prosecutor's argument was proper and the jury instructions were proper, there is no violation. The district judge's major complaint was with the failure to clarify the jury's complaint. You've got just a little over five minutes left. And I've got two things I'd like to ask you. And I won't give you five minutes for rebuttal, even if I take some of your time. One, the Gosho testimony that there was discussion of shooting. Is it clear to you where that discussion occurred? Yes, Your Honor. Can you tell me where we found that? Yes. On excerpts of record, page 68, Mr. Gosho said he switched from Mr. Vincenzio's car to Mr. Sarasota's car halfway down the street from Navar's house. Then on page 69, he talks about where he was in Mr. Sarasota's car. And then on page 70, he says, and this is the discussion we had regarding the shooting. So the jury can't. I don't think I have that excerpt here. Your opponent says, specifically Gosho at one point says such a discussion occurred at Nahar's, and he cites page 70. But also he says there was no discussion at 150. In any case, he never says whether the discussion occurred while Sarasota was there or while he was away. Your opponent said it did not occur in the car. Do you disagree with that? I disagree with it. And you have to find the answer on page 70. Is that right? I would say page 68 to 70. But what's important is the jury looking at this evidence could reasonably determine that Mr. Gosho was in Sarasota's car. Now, they have a different. Oh, yeah. He was in the car. But the question was, did the discussion about the gun take place in the car? Your opponents say it did not. It took place at the house, and there's no indication that Sarasota was even there. Mr. Gosho's testimony on page 69 through 70 of the excerpts of records show that it occurred in the car and not at the house. Okay. Well, that we can look at. The other thing is my view of this case would be that the most significant thing, if anything, is that he was the driver of the car. And the question is to what extent you rely on that and the manner in which the car was driven. Without that, he's no different from anybody else in the car. But he was driving. Now, what's significant about the fact that he was driving? Only if he drove the car in a manner which demonstrated somehow that he had knowledge of what was going to happen. Witnesses testified, and one witness in particular, Mr. Cook, testified that he drove in a swooping manner. He came at a high rate of speed up to the high school, slowed down immediately before the shots were fired. Shots were fired, then he immediately took off. And that is consistent with driving in a manner to aid in a drive-by shooting. And then the other evidence is what was said in the car. There was no statement. Now, is it consistent? You say it's consistent with a drive-by shooting. Is it also consistent with going down there to stop and get out and have a fight? I would say no, because no one bothered to try to get out of the car. Well, there was testimony by some people that they did. But even if it was consistent, that's not the standard. The standard is, looking at this evidence in the light most favorable to the prosecution, could a jury determine he was guilty? And a jury could. So you're saying that if the testimony regarding the driving is consistent either with doing a drive-by shooting or with going down to have a fight, that's enough for a conviction? The jury is presumed to have ruled or determined that evidence supports the prosecution, that any inconsistencies in the evidence are to be ruled. I'm not talking about inconsistencies. I'm talking about evidence that we all agree. I'm saying, assuming that, what you said the evidence could be, assuming that the evidence is consistent with both types of acts, either a drive-by shooting or a gang assault physically, you know, a fight, that if that's what the evidence is, that that's enough to support the conviction in this case. If the evidence could support the conviction, yes, because the jury is the ultimate decision-maker. So, you're saying that if the evidence is consistent with both types of acts, that's enough to support the conviction in this case? Well, I understand that. If that were the only question, we could save this whole argument. But there were other – there was other evidence. Nothing was said as the jury. All right. I know about the other evidence. I was just asking about the evidence regarding the driving. And my – Well, we're going to give you five minutes for rebuttal. And before we get that, I've got another question. Okay. And I'm not sure how long this will take. I'm on the double jeopardy question. It appears to me that Judge Kunauer didn't follow through. That is to say, if he was right, not only as to the Winship question, that is to say, the jury confusion relieving of a particular burden and so on, but if he was also right that there had been no proof beyond a reasonable doubt, he had to hold that double jeopardy prevents a retrial. I mean, I think he backed away from his own conclusion. I've got a different question, though, but it goes to the double jeopardy question, and that is Judge Kunauer says that we cannot consider, he can't consider, and therefore we can't consider the juror affidavits that come in. And he cites Federal Rule of Evidence 606B, which provides – and I'll just read the first sort of line of it. Upon inquiry into the validity of a verdict or indictment, a juror may not testify and so on and so forth. What if we have already set aside the verdict? That is to say, what if we set aside the verdict on the Winship ground, without regard to any juror affidavit, and we're now at the point where at least we get a retrial? Now I'm on the double jeopardy question, and I'm not asking whether there was enough evidence to support a verdict, but I'm rather asking whether there was enough evidence presented to this jury to get a verdict out of this jury of guilt, and I've got two affidavits that say no. Do I get to consider those affidavits? Because I'm not considering it now in order to set aside the verdict. I've done it already. I'm doing it instead to decide the double jeopardy question. I'm sorry that's a long question, but do you follow it? I do, Your Honor. And if the Court is considering the evidence to determine whether there was sufficient evidence presented to this jury, no. Regardless of whether evidence rule 606 would apply, Herrera v. Collins, the Supreme Court said in determining insufficiency of the evidence, whether there was sufficient evidence, you look only at the record evidence. You do not consider newly discovered or external evidence. You look only at the evidence. No, but that's other evidence as to what happened. I understand Herrera, but that's other evidence to what happened in terms of on the ground. Did the brother confess or whatever? I mean, there were two brothers involved in Herrera. But here I'm going, this is evidence not as to what happened, not evidence that was considered at trial. This is evidence as to what the jurors themselves thought of the evidence. And I've got evidence here, if I can consider it, that tells me the two jurors thought there was insufficient evidence. Do I get to consider that? No, Your Honor. And, again, in considering the double jeopardy issue, the issue is, was this verdict overturned because of insufficient evidence? Either the jury reached an acquittal, the State's highest court reached an acquittal by finding insufficient evidence, or this Court overturned the verdict based on insufficiency of the evidence. If it's not. My premise is that we're not overturning on insufficiency. We're overturning on the winship ground. The double jeopardy does not bar retrial. But, of course, it does bar retrial if it turns out there was insufficient evidence. Only if the verdict's overturned on that basis. If the verdict is not. Why is that a qualifier? Because if the verdict's not overturned because of insufficient evidence. In other words, if the Court were to say we're reversing, and I'm sorry I don't have the Supreme Court case on the top of my head, but if the Supreme Court were to say if the Court reverses and notes that in finding constitutional error, that because of this constitutional error, there was insufficient evidence, that's not enough. There has to actually be the equivalent of an acquittal. And in determining whether it's the equivalent of an acquittal, the review is limited to record evidence. Okay? Thank you, Your Honor. Thank you. Good morning. May it please the Court. Patricia Novotny, who with my co-counsel, David Zuckerman, is appearing today on behalf of Cesar Sarifzad, whose parents are present in court today. I'd like to pick up with the Winship issue first and then move on to the sufficiency issue, if I may. And I hope I have time to discuss the double jeopardy issue as well. Very, very recently, the Washington Supreme Court undertook to inventory those court of appeals cases in Washington that had gotten accomplice law right and those that had gotten it wrong. In declaring in In Re Domingo that Washington law has always rejected the in-for-a-dime, in-for-a-dollar theory, the Court in Domingo observed that the court of appeals, and I quote, The Court expressly excluded from this list of correctly decided court of appeals cases two cases, one of which they have since corrected, that is, the Swenson case. The other case, the lone exception, the only exception, is the Swenson case. And I quote, The only other court of appeals case that deviated from the correct rule is Mr. Sarasate's. And it is we are here today to ask this Court to correct that. You said expressly? Yes, Your Honor. Expressly. They listed the court of appeals cases that had gotten it wrong and they pointed to two that had not. Mr. Sarasate's was one of those. Mr. Swenson's was the other. I confess I have not read In Re Domingo. Is it in your brief? It's in our supplemental statement of authorities, Your Honor. It was just published in September. And did you – is it supplemental statement of authorities? Is it 28J that came in? Yes. And when did you send that in? About three weeks ago. Okay. Now, it may well have come to my office and I haven't read it yet. Okay. Thank you. I think that settles the question on where we look for the statement of State law. We know from this recent Washington Supreme Court case, In Re Domingo, that what the State must prove for accomplice liability, and in particular, we know from State v. Cronin, that to prove a person is an accomplice to murder, the State must prove the accomplice knew that his confederate would commit murder. And that's a verbatim quote from Cronin about what the test is for murder. Had you – I'm sorry. If the accomplice knew they were going down to do it bad by shooting, that would be enough, wouldn't it? No. That's not correct. The Washington – and this gets back to the Domingo case. The Washington State Supreme Court two months ago pointed to State v. Saraset or Saraset v. State, the PRP, where the court of appeals held that going along for a drive-by shooting would be enough to convict for murder, and they said in Domingo that's wrong. That's – I can understand saying that the in for a dime, in for a dollar theory is wrong, but that doesn't necessarily mean that if you know you're going for a drive-by shooting, and that's what happens and it results in a death, that there's something wrong with that. Well, again, I think I'd just refer you to In re Domingo. Well, I also haven't seen the supplemental citation, but we will – certainly those of us who haven't read In re Domingo will. I think it's important to note that in the companion case to Cronin – But I must say I found that an odd rule that you go along with somebody who's going to shoot someone, and you know you're going along to help them shoot someone, that you're not an accomplice. I think – I mean, that could well be the rule, but it seems odd to me. Well, I think the court in Domingo and in Cronin quite expressly is drawing a distinction between knowing that your confederate is going to shoot to kill, which is the And knowing that they are perhaps recklessly going to fire a weapon. And I think that's what, you know, importantly distinguishes these two things. It's less than – Well, isn't the object of a drive-by shooting to shoot somebody? Well, a drive-by shooting is a separate crime. It can have as its object to intimidate people, to harass them. It doesn't necessarily – Would it be grounds in Washington for acquitting the shooter of murder if he says, well, I told the driver to drive slowly because I fully intended to shoot him, but I only wanted to wing him. I didn't intend to kill him. And would that be a full defense in Washington for the shooter to a claim of murder? If I understand your question correctly, if in fact they fail to prove the mens rea of intent to kill for the shooter, yes, it would be. That is an essential element of the crime of intentional murder. And an intent to wing but not an intent to kill would be a full defense. Exactly, Your Honor. And that's where you'd be at then is felony murder. And this gets me back to the Roberts, the companion case, where the court noted that the prosecutor complained about how hard it was or would be under the new rule or what they thought then was a new rule. They complained you would not be able to obtain accomplice liability to certain murders because they happen too fast for the person to actually know that a murder is going to happen. And the court said, well, then felony murder is your remedy. Said to the State, that's then where you go with this. And they said it's not a – I'm sorry. Part of the question is what is a drive-by shooting. Is it – is your view of a drive-by shooting a shooting intended to fire bullets just to scare people but not to hit them? Well, the – Is that a drive-by shooting as opposed to a planned murder? It's a distinct crime, and the mens rea is recklessness. And it actually didn't even exist when this particular incident occurred. I noticed it's a separate statute for drive-by shootings. It doesn't seem to be a very serious offense. That's correct. I think they were trying to encompass all manner of reckless gunplay. And so that if it leads to death, then they go to felony murder. And if, furthermore, if you can prove an intent to kill, then you're an intentional murder. But drive-by shooting is a separate offense based on recklessness. It's sort of a – What's the felony of the company's felony murder in a drive-by shooting? It could be – you know, I'll have – I'm not sure drive-by shooting itself, but assault in the first degree. But it may be drive-by shooting itself may aggregate to second degree felony murder. I honestly don't remember at this point. Was there objection during argument to the prosecutor's in-for-a-dime, in-for-a-dollar talk? No, there was not an objection. They had very strenuously argued that issue at the instructional phase and at halftime about what the law in the State of Washington was. But it was clear that the trial judge agreed with the prosecutor that that encompassed or described the state of the law. Now, as did, of course, the panel of judges on Mr. Sarasate's first appeal, and as did, I might add, four dissenting justices at the Washington Supreme Court. But what is the reversible error here? It's not the prosecutorial misconduct, is it, in making the argument? No, we've – I'm sorry. That's not – that's not the – No, we've argued that the error is a Winship error, that is, that the jury was relieved of its – or the State was relieved of its burden to prove every element of the crime by what? By what? By the failure of the court to clarify what the law was. It's a combination of factors. So the error really is the failure of the district judge or the trial judge to clarify the law when the jury expressed confusion. Repeatedly expressed confusion. That's right. The – Now, the ordinary rule is, of course, that whatever the prosecutor argues is not law. That's correct. That is correct. But – and I think if we didn't have the jury inquiries, you know, we'd be in a different position. But we have the jury coming out three different times and saying, we don't understand this. We don't understand in particular the mental element. And in the last time, asking this very explicit question. Yes.  But let me – and I understand the jury was confused and asked for clarification. What's your answer to Weeks v. Virginia? Weeks v. Virginia. Angeloni. Well, in that case, the Court referred the jury to a very precisely worded paragraph that actually did answer their question. Here the Court just referred the jury back to the same instructions that caused their confusion in the first place. Well, in Weeks v. Virginia, they were confused by the instruction. And the jury said – I mean, the Court said, as long as the instruction is correct, the Court may simply do that, even though the jury is confused. But in that case, it appeared that the jury's – the help that the Court provided by pointing them to this express – this particular paragraph actually did clear up their confusion. It's not like here, where they kept – the Court kept pointing there, but they kept coming back and saying, we don't get it. We don't get it. We don't get it. Was there any instruction by the Court that what the prosecutor argues is not the law? I'm trying to figure out what the jury is making of the prosecutor's argument. Is – is the jury thinking that the prosecutor is helping them out with further explanation of the instruction, that then they're supposed to – so long as there's no objection to that, they're just supposed to believe it? So what is the judge telling the jurors about the status or authority of the prosecutor's argument? Anything? I'm – I don't remember exactly the Court's general instruction on this matter. It may well include a provision that the argument is not a statement of the law. We can look in the record. Okay. I'm sorry. You don't know. Okay. I don't remember. I still am having trouble with how you distinguish Weeks. Weeks seems to say that if the instruction is correct and the judge tells the jury to look at that instruction and they'll find the answer there, that that's enough, even though the jury was confused when it did go there in the first place. Well, again, I think the record in Weeks is quite different. The question that they posed in that particular case, if you looked in that particular paragraph that the Court referred them to, it actually did answer their question. And they just needed – like they were in a library and they just couldn't find it, they needed some help. They didn't come back and say, okay, we read that, but we still don't understand. And that's what happened in this case, three times. But at some point the jury does come back with a verdict. Are we to assume that they decided it irrespective of the fact that they didn't have a clue what was going on, or are we to assume that they somehow resolved their questions and came to a conclusion? Well, I think the standard is, is there a reasonable likelihood that they didn't. And I think we satisfy that. But I think there's a near certainty that they didn't. And I would suggest that what you're pointing to – But how would we know that? Isn't the verdict evidence to the contrary? Or at least don't we have to take the verdict as evidence to the contrary? Well, not in the face of their expressed confusion. And I think Bolenback is support for that particular – But the fact that they've asked questions and obtained answers, and although they asked the questions several times in several different ways, they got an answer each time that referred them to a set of correct jury instructions. Now, if the jury continued not to believe those – not to understand those things, then perhaps the jury might have come back and said we're hopelessly deadlocked because we don't understand what we're supposed to decide here. But they didn't. And so if we were to adopt your theory, it seems to me that almost any time we had jury questions expressing some confusion, we would never have confidence that the jury had resolved those correctly. Well, I think you would be hard-pressed to find circumstances that are like those present here, where the prosecutor is arguing a theory of what the law means. The prosecutor, you know, cloaked in the authority of the State, is arguing this theory that is later completely repudiated as wrong, but which, you know, seven members of the highest courts in the State had embraced post-conviction to suggest that somehow this jury sorted out what these seven appellate judges could not is just beggar's credulity. And I think, again, our standard is, is there a reasonable likelihood that they didn't? I've got a slightly different cut of this, and I guess in a sense a slightly different cut at least in its possible applicability. It's not that the judge had a clear idea of the law and he simply refused to explain it to the jurors when they sent out this question or these questions and simply, you know, he does the normal trial judge thing, which is to say I don't want to get in trouble, so I'm just going to say look at instructions number 1, 2, 3. Had the judge explained the law further, I gather he would have explained it in the erroneous way that the prosecutor understood it. So this is not in a sense, well, the judge would have taken care of everything if he had only explained further. No, he would have simply said, well, the prosecutor got it right. Now go decide it on this basis. So what do we do with that? Well, I think that, again, makes this case, you know, virtually unique in the cases that I've reviewed on this particular issue. That is, the judge wasn't in a position to give the right answer because there was such a state of confusion about what that answer was. No, the judge agreed with the prosecutor's argument as to what the law was. The prosecutor's view of in for a dime of the dollar, as I understand it, was what the view was of the trial judge, was the view of the court of appeal. Eventually, it turns out not to be the view of the Washington Supreme Court. And I will say the Washington Supreme Court, when it does the personal restraint petition in this case, not the Domingo, which I've not read, doesn't say that the prosecutor got it right. I reread that. That's correct. It says in stack, irrespective of some, whatever flaws there might have been in the prosecutor's argument, she focused on, da, da, da. The prosecutor, the personal restraint petition case in this case, when the Supreme Court gets it for the second time, they do not say the prosecutor got it right. They say that whatever flaws might have existed, the prosecutor had her attention, and she focused the attention elsewhere. That's right. In effect, in the PRP, they moved the goalposts on Mr. Sarasate, essentially, in which this whole drive-by shooting thing said in for a dime didn't mean what it said in all of these other cases and how we interpreted it before. I think that's right. You've got five minutes. Do you want to talk about your main point? Yes, Your Honor. Thank you for knowing what that is. Yeah, I would like to talk about the sufficiency issue. And in particular, I'd like to make a couple of record corrections. For example, the prosecutor said to you that Mr. Sarasate was placed at this party where Mr. Vicencio had the gun. That's not correct. You cannot find that in the record where Mr. Sarasate was placed at the party. And in particular, Mr. Vicencio himself testifies that, to his knowledge, Mr. Sarasate did not know that he had a gun, did not know that he had a secret compartment. So that's just flatly contradicted by the State's own witnesses. There's no inconsistency there. That's just the way it is. The same thing goes for this discussion about shooting that Mr. Gosho, and only Mr. Gosho, discusses. We can't even place where Mr. Gosho was when this supposed discussion happened. At one point he says it's in the house, or he didn't say that. He says it's everybody in the house. And another time he says it's in the car. And then he tells us he was in Mr. Sarasate's car to start with, and then he says he was in Mr. Vicencio's car to start with. In any case, he switched cars. We don't know where this discussion occurred. But here's the main point about that. Mr. Gosho is consistent in testifying that among the many possibilities the boys talked about in terms of what they might do to the other gang, shooting came up. But he's clear that no one ever, that never resolved into a plan. Not a single person thought that's what was going to happen, including Mr. Gosho. And he expressly excludes Mr. Sarasate as being part of any plan to shoot. That is, it never ripened into anything more. And even in Mr. Gosho's testimony, and that's the strongest evidence the State offers you with respect to the driving. Again, there is nothing about Mr. Sarasate's driving that isn't completely consistent with how he drove earlier and completely consistent. The State's argument today, oral argument, is that the driving is consistent either with a drive-by shooting or with an attack. And the jury is free to pick one of those alternatives and draw the inference that that's what kind of driving was and that that's enough to sustain at least that part of the case, that there was an intent to commit a drive-by shooting because that car was driven in a way that's consistent with that as well as with something else. And you can draw either inference. Yeah. The State tries to turn what is a correlation into a causation. That is, Mr. Sarasate or Mr. Ronquillo takes the opportunity of the car slowing to either stop or turn to pull out this weapon and shoot. But that doesn't mean Mr. Sarasate drove the car in order to facilitate that. You cannot draw that inference without more. It's like I walk out, I see a man on a bridge. Is he going to jump? Did he just push somebody? Is he admiring the sunset? Without something more, I can't tell. All of those things are possible. We have testimony that the car makes a swooping, swooping motion. I guess I have a mental image in my own head as to what swooping means. Maybe you can tell us what swooping is. This is not somebody who was affiliated. This is another person. That's right, Mr. Cook. Yeah. Swooping is certainly a much more colorful verb. That's what it means. It's a more colorful description of slowing to turn or to stop or, in that particular case, to turn. I think also swooping may be sort of veering to one side. One might deviate just slightly in order to get closer. Yes, I think you could add that to swooping, but I don't think that gets you anywhere. That is, that's the same way that he drove earlier in the day. They swing by to shout, to wave their flags, and then they continue on. This intersection required you to do something. You couldn't go straight ahead. And the car behind Mr. Sarasate's car stopped. And I guess this is the other interesting thing about Mr. Cook's testimony, and the only one who described this, and maybe he was an English teacher or something, as swooping, is that he says he was directly behind Mr. Sarasate's car. No other witness says that. He's clearly further back than that. Now, I just don't see how that ---- I couldn't tell where the swooping occurred. Mr. Cook's testimony was that he first saw this 150 feet down the block from which you then make a turn. And he seemed to say the swooping took place as they went around and made a turn. And he said, I couldn't have. First he went west. Then he went east. But the swooping didn't seem to appear to be right at the time of the shooting. It appeared to be in connection with the turn into that avenue. Is that right? Well, it's a little hard to tell, again, from Mr. Cook's testimony what exactly he's referring to, because he places himself in different positions relative to the car. But the intersection requires you to do something. And the students are here, and the cars all turn this way in the morning and in the afternoon. They take exactly the same kind of route. And, yes, at some point he views this from here, and then later he says he's down here. So I don't know what to make of that, except it's kind of a wash. And, again, apart from the fact that he adds a little more colorful metaphor, the description of what the car actually does is consistent with what everybody else says. It slows to turn or stop. And, in fact, some members in Sarasota's car actually did prepare themselves to get out, and as did Mr. Vicencio. One of the witnesses from the other gang who was the, whatever the initials were, the victims, one of the victims said that the car actually stopped. And one said it went slowly. And Mr. Cook said it went slowly. And some of the people in the car said it stopped. Well, I guess the jury could, if it wanted, assume it went slowly. They could take either version. I think, yes. The problem seems to be that going slowly by is consistent with either preparing to stop or doing a gratified shooting. And is the jury then entitled to draw the unfavorable inference? I think not without more. And I think that's where you get down to, like, the Juan H. v. Allen, where you have just, you know, two completely entirely equally likely possibilities. Something has to tip them one way or another. In order for that to be a rational inference or a logical inference, what the State does here is it points to what is essentially an equivocal piece of evidence. And they say, well, here's this evidence. Well, you could tip it if you knew that the – if you had other reasons to think that the purpose of the visit was not to just have a rumble, but to have a shooting. If you had that, then that might tip it, right? Yes, but there's no evidence that anybody, you know, we don't know what Ryan Ronquillo was thinking, but no one had testified. They were unanimous on this. There was no plan to shoot. And, in fact, I think you have to observe the other point on which they're unanimous, which is that in the aftermath of the shooting, immediately upon that happening, each one of the State's witnesses and defendants alike expressed surprise and shock. Now, that does not seem at all consistent with this being part of the plan. They weren't carrying out a plan. Ryan Ronquillo was acting on his own, and everyone, including Cesar Sarasot, was absolutely caught at a loss. I think it's important for us to know what was going on. Thank you, Counsel. I would like to just – Well, we've given you more than enough time. Oh, I'm sorry. Since you got something – Thank you. If you had something really critical, we'll give you another 30 seconds. No, Your Honor, I appreciate your generosity. Thank you very much. Thank you. Thank you, Your Honor, for the extra time. Counsel argues that everyone in the car was at a total loss. They were totally surprised. Well, that was not their actions. Their actions were, Mr. Sarasota, as soon as the shooting was done, hit the speed, drove radically at a high rate of speed out of there. No one said, what the hell were you doing? Why did you shoot? They all said, don't worry, that wasn't Vanessa who was hit. Now, they could tell the jury, oh, we were shocked. But the jury is presumed to have said, you're lying. The jury is presumed to have found that part of their testimony incredible. And the evidence, what did they do? Did they go to the police and report them? No. They helped destroy the evidence. They helped get rid of the gun. They helped get rid of the shell casings. Did they tell the truth when the police came? No. Mr. Sarasota lied to the police about his whereabouts and what he had been doing. That is the other piece of the puzzle the counsel was talking about, the discussion in the car regarding the shooting. So would you say that everybody in that car was guilty of being an accomplice? It's hard to say at this point since several of the members pled to a lesser charge. Certainly, the jury could not reach a verdict as to Mr. Reyes, who was charged as an accomplice. So the other's argument is stronger because they weren't the driver. But one of the passengers, there was testimony that one of the passengers, in addition to the bandana on Mr. Ronquillo, put his coat over his head. That's further evidence that as they were driving by, they didn't intend to get out. They were covering their identities so they wouldn't be seen. So your answer is yes, I gather, that everyone in the car is an accomplice. My answer is that the jury could find they were not an accomplice. That would be an issue for the, if they had. And they could find they were an accomplice. Find they were an accomplice. But that would be an issue for the jury to decide. The evidence in this case, though, is clear that Mr. Sarasot acted as an accomplice because of reason. But what's clearer about Mr. Sarasot than about anyone else in the car other than that he was the driver? He was the driver. He was sitting right next to Ronquillo. He was engaged in, I guess it's difficult to say what would the jury have done with the other individuals. I don't know what the jury would have done. I was asking you whether there was sufficient evidence against all of the other people in the car under your theory of liability. I would submit there is. It's not really an issue that needs to be decided. But I would submit there is. But what's important is there is sufficient evidence for Mr. Sarasot because a reasonable person in his situation would know, have general knowledge that he was engaging in the commission of the crime. As would everybody else on my part have the same knowledge. Yes. If we were simply to affirm Judge Kuhnhauer, that is to say, set the verdict aside on the Winship ground, yet allow retrial for a reason that I'm a little unclear on, would you in fact retry this case? I am not the prosecutor. That is a decision the prosecutor would have to make. I believe they would. I can't speak for them. Mr. Sarasot has served part of his sentence, but he still has a lengthy sentence left to serve. That's a long sentence. And the shooting was in, I think, 1994. Yes, Your Honor. Yes, Your Honor. Briefly addressing the issue regarding the prosecutor's argument and the jury instructions, this case is exactly like Weeks v. Angelone. The court must presume that the jury understood the judge's responses to their questions and the fact that they did not come back with further questions is a further argument. How can it be like Weeks when, in fact, in Weeks, if the judge had spoken, he would have explained it accurately, as in here, the judge would have given an erroneous view of the law which coincided with what the prosecutor said? Well, Your Honor, it's – I understand your position on that, but the point is that's not what occurred. And what did occur was the judge properly instructed the jury. And what the judge told them was look at these specific instructions. And co-defendant for – I think absent the prosecutor's explanation of the instructions, that's absolutely right. Excuse me, Your Honor. But looking at the facts of the case, this is a reason – the State court decision in this case was a reasonable application of the Weeks case. And since there's no other Supreme Court case which would entitle Petitioner to relief on this claim, he is not entitled to relief. We would ask that the Court reverse the district court and remand for further proceedings. Thank you. Thank you, Judge. The case just argued will be submitted.
judges: Reinhardt, W. Fletcher, Bybee